# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: LINCOLN NATIONAL 2017 COI RATE LITIGATION | Master File. No.: 17-cv-04150-GJP |
| This filing relates to: All Actions | Jury Trial Demanded |

## CONSOLIDATED CLASS ACTION COMPLAINT

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan
Robert A. Hoffman
Lisa M. Port
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

Stephen R. Basser
One America Plaza
600 W. Broadway, Suite 900
San Diego, CA 92101

**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.**
Andrew Friedman
Kimberly Page
2325 E Camelback Rd #300
Phoenix, AZ 85016

**GIRARD GIBBS LLP**
Daniel C. Girard
Angelica Ornelas
601 California Street, #1400
San Francisco, CA 94108

**SUSMAN GODFREY L.L.P.**
Steven G. Sklaver
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029

Seth Ard
Jillian Hewitt
Lucas Issacharoff
1301 Avenue of the Americas
32nd Floor
New York, NY 10019

**THE MOSKOWITZ LAW FIRM, PLLC**
Adam M. Moskowitz
Howard Bushman
2 Alhambra Plaza
Suite 601
Coral Gables, FL 33134

*Attorneys for Plaintiffs and Members of the Plaintiffs' Steering Committee*

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................. 1

THE PARTIES........................................................................................ 5

    A.    Plaintiffs ................................................................................ 5

    B.    Defendants ............................................................................ 9

JURISDICTION AND VENUE ............................................................. 9

FACTUAL BACKGROUND ................................................................ 11

    A.    The Policies at Issue........................................................... 11

    B.    Lincoln's 2016 COI Increases ........................................... 14

    C.    Lincoln's Unlawful 2017 COI Increases ...........................22

        1.    The 2017 COI Increases Were Not Based on the Enumerated Factors ...............................................23

        2.    The 2017 COI Increases Operate to Recoup Past Losses .........................30

        3.    The 2017 COI Increases Are Not Uniform...............................32

COI INCREASES CLASS ACTION ALLEGATIONS.............................. 33

FIRST CLAIM FOR RELIEF
Breach of Express Contract against Lincoln
(on behalf of Plaintiffs and the COI Increases Class).................. 36

SECOND CLAIM FOR RELIEF
Breach of the Implied Covenant of Good Faith and Fair Dealing
(on behalf of Plaintiffs and the COI Increases Class).................. 36

THIRD CLAIM FOR RELIEF
Injunctive Relief as to COI Increases
(on behalf of Plaintiffs and the COI Increases Class).................. 37

FOURTH CLAIM FOR RELIEF
Violations of the North Carolina Deceptive and Unfair Trade
   Practices Act, N.C. Gen. Stat. § 75-1, *et seq.*
(on behalf of Plaintiffs and the COI Increases Class) ................................................. 39

FIFTH CLAIM FOR RELIEF
Violations of California Unfair Competition Law,
   Cal. Bus. & Prof. Code §§ 17200 *et seq.*
(on behalf of the Kesselhaut and Trinchero Plaintiffs and the
California Sub-Class) ................................................................................................. 40

SIXTH CLAIM FOR RELIEF
Violations of California Elder Abuse Statute,
   Cal. Welf. & Inst. Code §§ 15610 *et seq.*
(on behalf of the Kesselhaut Plaintiffs and the California
Elder Abuse Sub-Class) ............................................................................................. 42

SEVENTH CLAIM FOR RELIEF
Tortious Breach of the Duty of Good Faith and Fair Dealing
(on behalf of the Kesselhaut and Trinchero Plaintiffs and the
California Sub-Class) .................................................................................................. 43

EIGHTH CLAIM FOR RELIEF
Violations of 28 Tex. Admin. Code §§ 21.2206 to 21.2212,
   Tex. Ins. Code art. 21.21
(on behalf of Plaintiff Life Partners and the Texas Sub-Class) .................................... 45

PRAYER FOR RELIEF ..................................................................................................... 48

DEMAND FOR JURY TRIAL .......................................................................................... 49

Plaintiffs Robert L. Trinchero; Marshall Lewis Tutor; Nancy S. Kesselhaut, Arthur M. Kesselhaut, and Warren M. Stanton as Trustee of the Kesselhaut Trust Agreement dated August 24, 1989 (the "Kesselhaut Plaintiffs"); William Lin Patterson; Advance Trust & Life Escrow Services, LTA, as nominee of Life Partners Position Holder Trust ("Life Partners"); and Barry Mukamal, as Trustee of the Mutual Benefits Keep Policy Trust ("Mukamal"), on behalf of themselves and all others similarly situated, for their Complaint against Defendants Lincoln National Corporation ("Lincoln National") and The Lincoln National Life Insurance Company ("Lincoln Life" and; together, "Lincoln," "Lincoln Defendants" or "Defendants"), state as follows:

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiffs on behalf of themselves and all similarly situated owners of JP Legend 3000, LifeSight 30, LifeSight 31, LifeSight 32, JP UL 101, JP UL 102, JP UL 103, JP UL 130, JP UL 131, and Vision 20 life insurance policies (each a "JP policy") issued by Jefferson-Pilot Corporation ("Jefferson-Pilot").   Defendant Lincoln National is the successor-in-interest to Jefferson-Pilot.   In that capacity and in conjunction with Lincoln Life, the Lincoln Defendants have subjected Plaintiffs to unlawful cost of insurance ("COI") increases, thereby increasing the amount of the Monthly Deduction taken by Lincoln each month from the "accumulation account" funded by Plaintiffs for each JP Policy.

2.     The JP policies at issue are all universal life insurance policies (collectively, "UL policies") issued by Jefferson-Pilot and its affiliated entities.   The principal benefit of UL policies is that, unlike whole life insurance policies that require fixed monthly premium payments, the premiums required for UL policies are flexible and need only be sufficient to cover the COI charges and certain other specified expenses.   The COI charge – an amount

1

calculated using a "COI Rate" – is typically the highest expense charge that a policyholder pays. As a result, the provision in the UL policy explaining how and when COI charges can be adjusted is one of the most important terms of the contract.

3.      According to a letter sent to brokers by Lincoln Life in June 2017, the Legend 3000 series policy (Policy Form UL5023) was issued from 2004 until 2008; the LifeSight 30 series policy (Policy Form No. 94-300) was issued from 1995 until 2004; the LifeSight 31 and LifeSight 32 series policies (Policy Form Nos. 94-301 and 94-302) were issued from 1995 until 2005; the JP UL 101, JP UL 102 and JP UL 103 series policies (Policy Form Nos. J82-102 & 1590) were issued from 1983 until 1987; the JP UL 130 and JP UL 131 series policies (Policy Form Nos. J84-104 & 1585) were issued from 1985 until 1987; and the Vision 20 product (Policy Form No. 88-138) was issued from 1994 until 2003.  Lincoln substantially increased the COI rates on each of these policies in the summer of 2017 (the "2017 COI Increases").

4.      With the exception of the Legend 3000 policy, each JP policy states that COI rates "will be based on our expectation of future mortality, interest, expenses, and lapses," and that "any change" in COI rates "will be on a uniform basis for Insureds of the same rating class."[1]   On information and belief, each JP policy also states that "upon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors."

5.      The Legend 3000 series policy has somewhat different language: "At Our sole discretion, We may change the monthly cost of insurance rates or excess interest rate at any time. We will base any change on Our future expectations as to investment earnings, mortality,

---

[1]  Defendants admit this in the Declaration of Beth Desmonds ("Desmonds Decl.") submitted on November 8, 2017, on behalf of the Lincoln Defendants in *In re: Lincoln National COI Litigation,* No. 16-cv-06605-GJP (E.D. Pa.).

persistency, expenses and taxes."  The Legend 3000 series policy further states: "We will not make any changes in order to distribute past gains or recoup prior losses.  Any change in the monthly cost of insurance rates will apply to all insureds with the same combination of the following: Attained Age, sex, length of time the policy has been in force and rate class." [2]

6.      One principal benefit of UL policies is they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in-force.  This allows policyholders to minimize their capital investment and generate greater rates of return through other investments.  Any premiums paid in excess of the COI charges and expense components are applied to a policy's "accumulation account," sometimes known as "policy account" or "cash value."  These excess premiums earn interest, often called the "credited rate."

7.      The 2017 COI Increases followed a set of COI rate increases that Lincoln implemented in the fall of 2016 (the "2016 COI Increases") on a different set of UL policies that had also been issued by Jefferson-Pilot: the JP LifeWriter Legend 100, 200 and 400 policies and the JP Legend 300 policy. The 2016 COI Increases ranged from roughly 50% to roughly 95%.

8.      Lincoln's FAQ sheet distributed to agents indicated three reasons for the 2016 COI Increases: "Lower investment income as a result of continued low interest rates"; "Updated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations"; and "Updated expenses, including higher reinsurance rates."  The increase in COI rates was inconsistent with earlier Lincoln statements.  Among other things, for

---

[2]   None of Lincoln's statements to JP policy holders, to regulators, or to the market at large attributes in any way the 2017 COI Increases to a change in Lincoln's expectations concerning taxes.  Further, allegations regarding the lack of uniformity of the 2017 COI Increases for all of the JP policies at issue in this Complaint are based solely on "rate class" and are not based on the "Attained Age, sex, [and] length of time the policy has been in force."

example, in or around at least 2010 through 2014, Lincoln provided certain of the impacted policy holders with illustrations that reflected no change in future COI rates. Lincoln had also filed interrogatories with the National Association of Insurance Commissioners ("NAIC") in each year from 2010 to 2014 stating that it expected mortality experience to improve.

9.      In June and July 2017, Lincoln informed owners of the JP policies at issue in this Complaint that they would likewise be hit by a COI rate hike. The 2017 COI Increases were substantial increases – some as high as 200%, if not more – not justified by the permissible cost factors. The 2017 COI Increases are also not uniform among JP policyholders within the same rate class.

10.     The JP policies subjected to the 2017 COI Increases, like those impacted by the 2016 COI Increases, were originally priced with "reverse select and ultimate" COI charges, meaning that the policies were designed to generate high mortality profits in the early durations followed by projected mortality deficiencies (losses) in later durations. Jefferson-Pilot designed the policies this way in order to: (1) gain a competitive advantage by illustrating low premium costs to prospective purchasers; (2) generate early duration profits for the company; and (3) push losses into later durations that could be discounted at high interest rates thereby reducing the reported financial impact on overall profitability. Now that the JP policies are reaching the later durations when the priced-for losses were projected to occur, Lincoln is attempting to impose the excessive 2017 COI Increases to recoup prior losses, make the policies more profitable in future durations than the profit levels assumed at pricing, and cause policyholders to allow their JP Policies to lapse (causing "shock lapses") and thereby eliminate Lincoln's ultimate payment obligations under the JP Policies. This bait-and-switch practice is unfair to policyholders, and unlawful.

11.     The 2017 COI Increases breached the contracts underlying the JP policies in at least the following respects:

- The increases were based upon impermissible, non-enumerated factors;

- The increases were designed to recoup past losses rather than respond to future expectations; and

- The increases were non-uniform across JP policy insureds of the same rate class.

12.     Additionally, the Lincoln Defendants, and their Jefferson-Pilot predecessor, broke various state unfair trade practices and other laws governing the JP Policies at issue in this Complaint.

**THE PARTIES**

**A.     Plaintiffs**

13.     Plaintiff Robert L. Trinchero is a 76-year-old individual who, at all times material hereto, was and is a domiciliary of the State of California and currently resides in Angels Camp, California.  On or about May 25, 1997, Jefferson-Pilot, from its home office in Greensboro, North Carolina, issued to Mr. Trinchero, as both the owner and the insured, a JP LifeSight 32 policy (JL4448490) insuring Mr. Trinchero, with a face amount of $250,000.00.  On or about July 21, 2017, Defendants notified Mr. Trinchero that beginning August 25, 2017, "your policy's non-guaranteed cost of insurance (COI) rates will increase."  As a result of this increase, Mr. Trinchero – who had been paying a premium of $283.09 per month through automatic deductions from a designated bank account – was provided by Defendants with illustrations in August 2017 with two scenarios through which he was encouraged to pay: (1) a "new anticipated premium" of $612.56 per month for coverage through 2022 (to age 82); or (2) a "new anticipated premium" of $817.03 per month for coverage through 2024 (to age 84).  The anticipated premiums in the two scenarios are *2.16 times and 2.88 times greater*, respectively, than the

5

premium payments Mr. Trinchero had been paying with Lincoln's approval prior to the 2017 COI Increases being put into place.

14. Plaintiff Marshall Lewis Tutor is a 69-year-old individual who, at all material times hereto, was and is a domiciliary of the State of North Carolina. Mr. Tutor currently resides in Fuquay-Varina, North Carolina. On April 10, 1997, Mr. Tutor purchased a JP LifeSight 32 policy (JP4448202), with an initial specified amount of $100,000.00. On or about July 7, 2017, Defendants notified Mr. Tutor that beginning August 10, 2017, "your policy's non-guaranteed cost of insurance (COI) rates will increase." As a result of the increase, Mr. Tutor's monthly COI charge rose by *65%* – from approximately $77 to $127. Mr. Tutor's monthly premiums are also illustrated to increase at least 42% – from $200 to $284 – as a result of the COI rate increase.

15. Plaintiff Nancy S. Kesselhaut is an 80-year-old individual who, at all times material hereto, was and is a domiciliary of the State of California and currently resides in California. Plaintiff Arthur M. Kesselhaut is an 82-year-old individual who, at all times material hereto, was and is a domiciliary of the State of California and currently resides in California. Plaintiff Warren M. Stanton is an individual over the age of 75 who, at all times material hereto, was and is a domiciliary of the State of California and currently resides in California. On or about November 17, 1994, Jefferson-Pilot, from its home office in Greensboro, North Carolina, issued to Warren M. Stanton, as Trustee of the Kesselhaut Trust Agreement dated August 24, 1989, as both the owner and the beneficiary, a JP Vision 20 policy (JP4337712) insuring both Nancy and Arthur Kesselhaut with a face amount of $1,000,000. On or about August 15, 2017, Defendants notified Arthur Kesselhaut that the monthly deduction amount to be withdrawn from the policy value resulting from the 2017 COI rate increase was increasing. As a result of this increase, COI charges on the policy – which is funded by assets and proceeds of the assets

contributed by the insureds, Nancy and Arthur Kesselhaut – have increased by approximately *80%* for each of the next two years, with similar increases expected after that time.

16.     Plaintiff William Lin Patterson ("Lin Patterson") is and at all times material hereto was a domiciliary of the State of Oklahoma.  Mr. Patterson is the owner of a JP LifeSight 32 policy purchased in or about June 1998 insuring the life of William Lin Patterson with the policy number JF5006827 and with a face amount of $491,000.  On or about July 7, 2017, Defendants notified Mr. Patterson that beginning on August 11, 2017, the policy's "non-guaranteed cost of insurance (COI) rates will increase."  As a result of the COI Increase, Mr. Patterson's COI rates have increased roughly 52%.  Furthermore, based upon the drastic and unexpected projected COI increases, Mr. Patterson was forced to decrease the death benefit to $350,000 in order to maintain the policy in force without massive additional premium payments.

17.     Plaintiff Advance Trust & Life Escrow Services, LTA, as nominee of Life Partners Position Holder Trust ("Life Partners"), is located at 1401 New Road, Suite 200, Waco Texas 76711.  Life Partners is the owner of a JP Vision 20 policy purchased in or about November 1998 insuring the lives of Marie Everingham and Robert Everingham with the policy number JP5038835 and with a face amount of $1,000,000.  On or about July 2017, Defendants notified Life Partners that the policy's "non-guaranteed cost of insurance (COI) rates will increase."  As a result of the COI Increase, the COI rates on the Everingham policy have initially increased by over 40%.

18.     Barry Mukamal ("Mukamal") is a resident of Florida and Trustee of the Mutual Benefits Keep Policy Trust,[3] located at 43 S. Pompano Parkway, Pompano Beach, Florida

---

[3] The Mutual Benefits Keep Policy Trust was created in connection with an S.E.C. receivership of Mutual Benefits Corporation. Mutual Benefits was a company which sold investments in

33069.  The Trust owns a beneficial interest in the following JP Legend policies: JP5214933, JP5214932, JG5277074, JP5216209, JP5218293, and JP4383405, with varying face amounts ranging from $89,680 to $2,400,000.  As a result of and subsequent to Defendants' September 2016 notification to Trustee Mukamal that the COI rates associated with policies JP5214933, JP5214932, JG5277074, and JP5216209 (which are not at issue in this Complaint) under his ownership and control were increasing effective October 9, 2016, the monthly amounts to be withdrawn from the policies increased, effecting a consequent spike in annual premiums necessary to keep the policies in force and effect.  On June 29, 2017, Lincoln further notified Mukamal that the COI rates associated with JP4383405, which is at issue in this Complaint, was increasing effective August 1, 2017.  The monthly amounts to be withdrawn from the policy increased, leading to a consequent spike in annual premiums necessary to keep the policy in force and effect.  Specifically, the COI rate applicable to the policy increased by *35%*, which increased the monthly deduction from $32.06 to $47.58 per month, and increased associated premiums.

---

viatical insurance contracts, a transaction whereby the insured desires to sell the beneficial interest in a life insurance policy in order to receive cash, and the investor provides such funds in exchange for an interest in the death benefit of the policy. Mutual Benefits would take ownership of a policy and assign fractional interests in the death benefit to multiple investors. Mutual Benefits was placed into an S.E.C. receivership due to improprieties in the sale of the interests to investors. In May 2004, the United States District Court for the Southern District of Florida appointed a receiver for Mutual Benefits to protect the interests of the investors who invested in the Policies. The receiver, with the Court's approval, transferred all of the life insurance policies owned by Mutual Benefits to the Mutual Benefits Keep Policy Trust, and authorized the appointment of Barry Mukamal as Trustee. As Trustee, Mr. Mukamal serves as the owner and nominal beneficiary of the Policies in which thousands of investors hold interests, including the Policies at issue in this case. The Trustee is responsible for maintaining and administering the Policies for the benefit of the investors, including paying all premiums due, collecting funds from the investors to pay premiums, and taking all steps necessary to minimize the expense to the investors and maximize investor returns from the Policies.

**B.      Defendants**

19.      Defendant Lincoln National Corp. has its home office and principal place of business at 150 North Radnor-Chester Rd., Radnor, Pennsylvania 19087.  Lincoln National is and has been at all times material a corporation organized under Indiana law.  Lincoln National acquired Jefferson-Pilot for about $7.5 billion in cash and stock in a merger consummated in 2006.  Headquartered in Philadelphia, Pennsylvania, the combined company is one of the largest publicly traded life insurance companies in the United States of America.  Lincoln National's most senior executives – its CEO and CFO – both came to Lincoln from Jefferson-Pilot.  Lincoln National is the parent of its subsidiary, Defendant Lincoln National Life Insurance Company. Lincoln Financial Group is the marketing name for Lincoln National and its affiliates.  As a result of the merger of Lincoln National and Jefferson-Pilot in 2006, on information and belief, all of Jefferson-Pilots' insurance policies that are the subject of this lawsuit were absorbed, owned and controlled by the combined company, Lincoln National, which sold and operated its universal life insurance products through its subsidiary Lincoln Life and Lincoln National's marketing arm doing business as Lincoln Financial Group.

20.      Defendant Lincoln National Life Insurance Company is a life insurance company incorporated under the laws of Indiana, with a principal place of business in Radnor, Pennsylvania, as reflected in its own judicial filings in this District.  It sent the letters regarding the 2017 COI Increases.

<b>JURISDICTION AND VENUE</b>

21.      This Court has subject matter jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) and 28 U.S.C. §1332(a)(2) because this is a class action with diversity between at least one class member – the named plaintiffs are citizens of a foreign state and other

9

states beyond Indiana and Pennsylvania – and one defendant, and the aggregate amount of damages exceeds $5,000,000; and because the plaintiffs are residents of a foreign state and the amount in controversy exceeds $75,000.   This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d) and 28 U.S.C. § 1332(a)(2).

22.     This Court has general personal jurisdiction over the Lincoln Defendants because both entities maintain their principal places of business in this District.   This Court also has specific personal jurisdiction because many of the acts and decisions giving rise to this suit occurred in this District, and thousands of members of the proposed class likely reside in this district.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because the Lincoln Defendants reside in this district, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, including Lincoln's imposition of the 2017 COI Increases.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because Defendants maintain a business headquarters, business agents, and operations in this District; many thousands of Class Members either reside or did business with Jefferson-Pilot or the Defendants in this District; Defendants have engaged and continue to engage in business in this District; Lincoln National maintains its corporate headquarters in this District, which includes an investment department through which Lincoln National's investment decisions were initiated, rendered, engaged, approved or otherwise ratified in this District; Lincoln Life's written responses to NAIC interrogatories were, at all times material, vetted and approved by Lincoln National in this District; a substantial part of the events

or omissions giving rise to the claims at issue occurred in this District; and Defendants entered into transactions and received substantial profits from policyholders who reside in this District.

## FACTUAL BACKGROUND

### A.    The Policies at Issue

24.    As stated above, the JP policies at issue in this Complaint are: the Legend 3000 series policy issued from 2004 until 2008; the LifeSight 30, LifeSight 31 and LifeSight 32 series policies first marketed in 1995; the JP UL 101, JP UL 102, JP UL 103, JP UL 130 and JP UL 131 series policies issued from 1983 until 1987; and the Vision 20 product first sold in 1994.  Those policies were all flexible-premium, universal life policies issued by Jefferson-Pilot, with no fixed or minimum premium payments specified in the policies.

25.    Universal life policies combine aspects of permanent life insurance (life insurance policies that pay a benefit in the event of the death of the insured) with an interest-bearing account into which premium payments are made.  As a result, policyholders are able to adjust allocations of their contributions between the "permanent life insurance" component of their policy and the savings or investment component of their policy.

26.    In addition, policyholders can adjust both the amount and frequency of their premium payments so long as the policy value is sufficient to cover the monthly deductions in connection with the COI charges, as well as a small administrative fee.

27.    Lincoln determines the cost of insurance charge (which constitutes the majority of what the JP Policies call a "Monthly Deduction") on a monthly basis as the COI rate for the month, multiplied by the number of thousands of the so-called "net amount at risk" for the month.  The "net amount at risk" for a month is computed as the "death benefit for the month

before reduction for any indebtedness, discounted to the beginning of the month at the guaranteed rate," less "the policy value at the beginning of the month."

28.     Small changes in the COI Rate can produce a dramatic increase in the dollar amount of the Monthly Deduction charged by Lincoln, particularly at older attained ages. And consequently, the higher the COI Rate, the greater the amount of the premiums required to maintain a positive policy value balance and avoid a lapse of the policy.  The COI charge is by far the costliest and most important component of the Monthly Deduction charge, and of all charges on the policy.

29.     Value built up in a JP policyholders' interest-bearing account generates interest at a minimum guaranteed rate (or, potentially a higher non-guaranteed rate).   Absent other contributions, the interest generated is reduced by the amount of the COI charge and a charge for administrative expenses associated with the policy.  If the COI and administrative charge exceed the interest generated for the month (plus any amounts paid into the policy account), the policy value (and interest generating "principal") is reduced by the Monthly Deduction.

30.     As Jefferson-Pilot explained in some of its marketing materials: "Universal Life Insurance is a kind of flexible policy that lets you vary your premium payments. You can also adjust the face amount of your coverage …. The premiums you pay (less expense charges) go into a policy account that earns Interest.  Charges are deducted from the account.  If your yearly premium payment plus the interest your account earns is less than the charges, your account value will become lower.  If it keeps dropping, eventually your coverage will end.  To prevent that, you may need to start making premium payments, or increase your premium payments, or lower your death benefits.  Even if there is enough in your account to pay the premiums, continuing to pay premiums yourself means that you build up more cash value."

31.    The size of the COI charge is highly significant to Plaintiffs and all JP policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is deducted from the policy account (*i.e.*, the savings or investment component) of the policy, so the policyholder forfeits the COI charge entirely.

32.    Jefferson-Pilot's insurance policies (now Lincoln's) expressly limit the insurer's ability to increase COI Rates. Other than the Legend 3000 policy – which allowed consideration of "taxes" in determining the COI Rate and included Attained Age, sex, and the length of time a policy was in place in its uniform basis provision – the JP Policies contain the following contractual limitations ("the COI Rate Provision"):

> The monthly cost of insurance rates are determined by us. ***Rates will be based on our expectation of future mortality, interest, expenses, and lapses.*** Any change in the monthly cost of insurance rates used will be on a ***uniform basis*** for Insureds of the same rate class.

(Emphasis added).[4]

33.    The COI Rate Provision restricts the circumstances under which Lincoln may raise the COI Rate and does not permit Lincoln to increase COI Rates, for example, to cover for improper dividends Lincoln Life paid to Lincoln National, or miscalculations concerning past mortality assumptions, or past interest rates, expenses, or lapse rates.  Likewise, Lincoln is not permitted, pursuant to the policy terms, to increase COI charges to earn future profits higher than the level projected at the time the Policies were priced.  Under the JP Policies, COI Rates may

---

[4] The Legend 3000 policies contain slightly different contractual language: "We will base any change [in COI Rate] on Our future expectations as to investment earnings, mortality, persistency, expenses and taxes.  We will not make any changes in order to distribute past gains or recoup prior losses.  Any change in the monthly cost of insurance rates will apply to all insureds with the same combination of the following: Attained Age, sex, length of time the policy has been in force and rate class."

only be raised based on expected *future* events relating to the enumerated factors resulting from a deviation between actual and assumed experience using actuarially sound practices.

34.     Nowhere does the language of the JP Policies permit Lincoln to increase COI Rates and consequently increase the Monthly Deduction in order to recoup past losses or to recover for prior profits lower than the profitability assumed at pricing, including those associated with its guaranteed or non-guaranteed interest rates.  Nor do the JP Policies disclose any ability or intent to do so.  As such, Lincoln may not increase its COI Rates (and in turn, the resulting Monthly Deductions) to recoup past losses or to recover for prior profits lower than the profitability assumed at pricing.  Furthermore, Lincoln may not increase the COI Rates when there is no reasonable expectation of a future adverse change in mortality, interest, expenses and/or lapses.

35.     The JP Policies also state that "[u]pon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors."

36.     The JP Policies are all form policies, and insureds are not permitted to negotiate different terms.

**B.     Lincoln's 2016 COI Increases**

37.     In August 2016, Lincoln announced that it would be increasing the COI Rates on selected Jefferson-Pilot policies.

38.     In September 2016, Lincoln sent increase notices to policyholders of several Jefferson-Pilot product lines not at issue in this Complaint (specifically, JP LifeWriter Legend 100, 200 and 400 policies and the JP Legend 300 policy), announcing COI rate increases effective beginning in October 2016.  The 2016 COI Increases were in the range of 50% to 95%.

In seeking to justify the 2016 COI Increases to policyholders, Lincoln pointed to "nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets."

39.     At the same time, Lincoln sent a letter to its brokers stating that the 2016 COI Increases were being put into place on account of:

- "Lower investment income as a result of continued low interest rates";

- "Updated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations"; and

- "Updated expenses, including higher reinsurance rates."

40.     In a Consolidated Class Action Complaint filed on April 19, 2017, *In re: Lincoln National COI Litigation,* No. 16-cv-06605-GJP (E.D. Pa.) (the "April 19, 2017 Complaint") – two months *before* Lincoln announced the 2017 COI Increases – the plaintiffs alleged that *none* of the factors to which Lincoln pointed could justify or support the 2016 COI Increases.  The plaintiffs in that case ("the 2016 COI Increase Litigation") alleged, for instance, that Lincoln's expectations of future investment returns could not reasonably be materially lower than what Lincoln originally expected, and that any change in investment returns would be far too small to justify a COI increase of the sizes imposed, especially when combined with the dramatic improvements in mortality that occurred since the policies were priced.  (April 19, 2017 Complaint, ¶ 42).

41.     The plaintiffs further alleged that the 2016 COI Increases resulted in COI Rates higher than those set forth in illustrations sent to the 2016 COI Increase Litigation plaintiffs from at least 2010 to 2014.  (*Id*. ¶ 43).  As alleged, under the terms of the JP policies at issue in that case, and under basic actuarial principles embodied in Actuarial Standards of Practice 24, Lincoln was required to illustrate future COI rates based on Lincoln's then-*current* assumptions

as to mortality, interest, and any other experience factors that underlie the COI rates, but that because Lincoln's investment returns had not materially changed for the worse since the times when those illustrations were sent in 2010-2014, Lincoln could not claim that a change in investment return justified the increase.  (*Id.*)  The plaintiffs further alleged that Lincoln National's Q2 2016 reporting supplement showed a 5.22% earned rate on reserves, a mere tenth of a percent lower than the prior year, and that for the nine months ending September 30, 2016, Lincoln National reported that fee income from COI charges was up 9% over the first three quarters of 2015, while the "Account Values" and the "In-Force Face Amount" of universal life policies increased by only 2% as compared with the first three quarters of 2015.  (*Id.*)  Similarly, the plaintiffs alleged that on Lincoln's financial statements, Lincoln indicated that its "investment income" had *grown* in recent years, reporting: $4.551 billion (2012), $4.561 billion (2013), $4.648 billion (2014), $4.611 billion (2015), and $4.631 billion (2016).  (*Id.*)

42.     The plaintiffs in the 2016 COI Increase Litigation further alleged that Lincoln admitted that it was relying on its "past" and "continued" alleged lower investment returns to justify the 2016 COI Increases, which was impermissible under the COI Rate Provision at issue because a COI Rate increase could only be justified by changed *future* expectations, and that Lincoln's attempt to justify the 2016 COI increases based on "lower investment income as a result of continued low interest rates" was a "naked attempt to circumvent the guaranteed minimum interest rate that the policies promise to **credit** to policyholders."  (*Id.* ¶ 44).

43.     The plaintiffs in the 2016 COI Increase Litigation also alleged that reinsurance costs are not an enumerated permissible factor for an increase because, among other reasons, reinsurance is a cost that the insurer voluntarily undertakes with an undisclosed third-party; it is not a cost of directly administering the policy.  (*Id.* ¶ 45).  The plaintiffs noted that Lincoln's Q4

2014 results showed a $53 million *profit* on recapturing policies from out of (unidentified) reinsurance contracts, so that whatever changes there had been in Lincoln's future reinsurance costs could not provide material support for the 2016 COI Increases.  (*Id.*)  In this same regard, as a result of the merger with Jefferson-Pilot in 2006, Lincoln established a separate reinsurance program for the policies at issue (the "JP Program"), but had not mentioned in its annual reports any adverse change in the JP Program.

44.     The plaintiffs in the 2016 COI Increase Litigation also alleged that, although Lincoln claimed that changing mortality expectations have contributed to some of the COI increases, in fact the opposite was true.  (*Id.* ¶ 47).  The plaintiffs pointed to interrogatories that Lincoln filed in each year from 2010 to 2014 with the NAIC stating that it expected mortality experience to *improve*.   Lincoln's 2015 Annual Statement similarly stated that "mortality experience is also predicted to improve in the future."  And in its Quarterly Report on Form 10-Q filed with the SEC for the third quarter of 2016, Lincoln National informed investors that "[m]ortality was in line with [Lincoln National's] expectations during the third quarter of 2016." (*Id.*)

45.     The plaintiffs there also alleged that nationwide, mortality (normally the most important element in COI Rates) had continuously *improved* since the JP policies at issue in the 2016 COI Increase Litigation were issued (between 1997 and 2007).  (*Id.* ¶ 48).  The plaintiffs further alleged (*id.*):

> Beginning at least as early as 1980, the National Association of Insurance Commissions (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that were commonly used by insurers at the time the policies were priced to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO mortality Table. The accompanying report from June 2001 explained that

(a) the 1980 CSO Mortality Table was still the industry-standard table and (b) mortality rates had improved significantly each year since the 1980 table issued. The Society of Actuaries is currently investigating an update of the CSO tables with a current target publication date of 2017. An investigative report on the update of the CSO tables by the society was published in March 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to continuous mortality improvements since 2001.

46.     The plaintiffs in the 2016 COI Increase Litigation also alleged that Lincoln had sent the owners of the policies at issue several illustrations based on the pre-increase COI rates, and that although the policies at issue stated that illustrations would depict future COI rates based on "current mortality and interest factors," the illustrated COI rates provided by Lincoln were in fact significantly lower than what they were after the 2016 COI Increases. (*Id.* ¶ 49). The plaintiffs alleged this was the case even though mortality experience had not changed for the worse in the years since the illustrations were provided. Accordingly, because the illustrations were required to reflect "current mortality" when issued, and they illustrated lower future COI rates using those mortality assumptions, the plaintiffs alleged that Lincoln could not use its purportedly now-current mortality experience to justify a massive increase in COI rates. (*Id.*)

47.     The plaintiffs in the 2016 COI Increase Litigation also challenged the increases on the ground that they were implemented in order to recoup past losses. (*Id.* ¶¶ 51-60). The plaintiffs alleged that the requirement in the COI Rate Provision included in the relevant policies that rates be based "on our expectation of future mortality, interest, expenses, and lapses" prohibited rate increases based on a desire to increase profits beyond the level assumed at pricing or to make up for past losses. (*Id.* ¶ 51). The plaintiffs alleged that actuarial principles similarly prohibit the carrier from implementing a COI increase that would result in the carrier making more profit on the policies than it expected using its original expectations, noting that in its filings with the NAIC, Lincoln acknowledged that while "[c]ost factors that can vary are

periodically reviewed and may be adjusted based on changes in prospective assumptions," such adjustments "are made in such a way that past losses (*i.e.* experience less favorable to the company than expected) are not recouped."  (*Id*.)

48.    As alleged, Lincoln admitted that, contrary to these basic principles, it was using the 2016 COI Increases to recover past losses, pointing to "***nearly a decade of persistently low interest rates****, including **recent historic lows***, and volatile financial markets" to justify the increase, and stating to its brokers that the increases were due to "lower investment income as a result of ***continued*** low interest rates."  (*Id.* ¶ 52 (emphasis added)).  In support of their allegations the plaintiffs also pointed to: (1) a statement made in or around September 2016 – around the same time the increases were announced – by Lincoln's President and CEO Dennis Glass that Lincoln saw in-force repricing (*i.e.*, the 2016 COI Increase) as an opportunity to blunt the impact of the prevailing low interest rate environment (*id.*); (2) the circumstances laid out above indicating that a COI rate increase of the suddenness and magnitude of the 2016 COI Increases could not be supported by changes in Lincoln's *future* cost expectations (including dramatic improvements in mortality), but rather indicated that Lincoln was increasing its profit targets on an old, closed block of business in an attempt to recoup past losses; and (3) the illustrations sent to plaintiffs, which were required to be based on then-current mortality assumptions and which further undercut the purported reasons for the increases because mortality assumptions had not materially changed for the worse since the policies were issued. (*Id.* ¶¶ 52-53).

49.    The plaintiffs further alleged that in revealing that the 2016 COI Increases were allegedly due in part to "lower investment income as a result of continued ***low interest rates***" (emphasis added), Lincoln was seeking (1) to avoid its contractual obligation to meet the high

guaranteed interest crediting rates (4.0%) promised under the JP policies and (2) to recoup past losses or past profits lower than the level of profitability assumed at pricing – thereby increasing future profits to levels higher than those projected at pricing.  (*Id.* ¶ 54).

50.    The plaintiffs further cited (*id.* ¶ 55) a report issued in April 2012 by the Center for Insurance Policy & Research ("CIPR"), a branch of the National Association of Insurance Commissioners, which warned of the effects on insurers of a prolonged period of low level interest rates. That reported stated, in relevant part:

> Life insurance companies face considerable interest rate risk given their investments in fixed-income securities and their unique liabilities. For life insurance companies, their assets and liabilities are heavily exposed to interest rate movements. Interest rate risk can materialize in various ways, impacting life insurers' earnings, capital and reserves, liquidity and competitiveness. Moreover, the impact of a low interest rate environment depends on the level and type of guarantees offered. Much of the business currently on life insurers' books could be vulnerable to a sustained low interest rate environment ….

> Life insurers typically derive their profits from the spread between their portfolio earnings and what they credit as interest on insurance policies. During times of persistent low interest rates, life insurers' income from investments might be insufficient to meet contractually guaranteed obligations to policyholders which cannot be lowered.

> \*\*\*

> In a low interest rate environment, it is challenging to find relatively low-risk, high-yield, long-duration assets to match annuities that guarantee a minimum annual return (e.g., 4%). For many policies, low interest rates mean that some mismatch with assets is likely. For example, older fixed income insurance products that guarantee rates of around 6%—closely matching or conceivably even surpassing current investment portfolio yields—are likely to put a strain on life insurers as a result of spread compression or possibly negative interest margins.

CIPR Report, at 2-3.

51.    The plaintiffs alleged that, as feared in the CIPR report, Lincoln sought (1) to offset or subsidize its credited interest guarantees and recoup its past financial problems through

the 2016 COI Increases and resulting increased Monthly Deductions, (2) to avoid its obligation to credit the guaranteed interest rates under the policies, (3) to recoup past losses or past reduced profits, and (4) to shed the policies by making the premiums to maintain them cost-prohibitive for the JP policyholders – thereby frustrating the policyholders' ability to realize the contractual benefits of the policies at issue.  (*Id.* ¶ 56).

52.     The plaintiffs similarly alleged that when Jefferson-Pilot priced and sold the JP policies at issue in the 2016 COI Increase Litigation, it established a Monthly Deduction schedule that was designed to generate high profits in early durations followed by potential losses in later durations, but that Lincoln, as the successor to Jefferson-Pilot, sought to reverse that decision by imposing the 2016 COI Increases to recoup the reduced profits and losses resulting from the rate schedule the company it acquired had enacted.  (*Id.* ¶ 57).  The plaintiffs contended that non-guaranteed elements such as the COI Rate and Monthly Deduction are required to reflect future expectations, not past experience, and that allowing Lincoln to re-determine those non-guaranteed elements to recoup past losses or past constrained profits would violate the actuarial standards of practice.  (*Id.* ¶ 58).

53.     Finally, in this regard, the plaintiffs alleged in the April 19, 2017 Complaint that the policyholders hit hardest by Lincoln's actions were elderly JP policyholders, many of whom had "dutifully paid premiums for over a decade or more based on the expectation that in their twilight years the Policies would provide protection for their families."  (*Id.* ¶ 59).  The plaintiffs noted that due to age-related underwriting considerations, life insurance protection for such elderly policyholders, including certain of the plaintiffs, had become, by late 2016, either unavailable or prohibitively expensive, and that Lincoln's actions had therefore stripped such plaintiffs and policyholders of future life insurance protection.  (*Id.*)

### C.      Lincoln's Unlawful 2017 COI Increases

54.      In approximately June 2017, Lincoln announced that it would be increasing the COI Rates on ten additional selected JP policies.  The 2017 COI Increases apply to the following Jefferson-Pilot policy forms: Legend 3000; LifeSight 30, LifeSight 31, and LifeSight 32; JP UL 101, JP UL 102, JP UL 103, JP UL 130 and JP UL 131; and Vision 20.

55.      At the time Lincoln sent the letter to its brokers in 2017, it knew that the 2016 COI Increase Litigation had been filed and that the plaintiffs had cited in support of their allegations the admissions contained in Lincoln's earlier letter notifying its brokers of the 2016 COI Increases, including those set forth above in ¶¶ 38-39.  Lincoln was also well aware of the full range of allegations set forth in the April 19, 2017 Complaint, as summarized above.

56.      Whereas the letter to policyholders announcing the 2016 COI Increases acknowledged expressly that those increases were being undertaken in light of *past* investment experience, writing that the increase followed "nearly a decade of persistently low interest rates" and "recent historic lows," which were cited as admissions in the April 19, 2017 Complaint, Lincoln reworded its announcement of the 2017 COI Increases to avoid making similar admissions. Lincoln's 2017 letter to its brokers nevertheless contained false and pretextual explanations for the 2017 COI Increases, and also contained additional admissions demonstrating that the new COI Rate increases fail to comply with the operative contract terms of the JP Policies and are otherwise unlawful.  Lincoln told its brokers that the 2017 COI Increases are the result of:

- "Updated mortality assumptions that include instances of both higher and lower expected mortality versus prior expectations;"

- "Expected lower investment earnings as a result of projected low interest rates and lower future account values;"

- "Updated expenses;" and

- "Updated assumptions of future policyholder persistency/lapses."

The notices Lincoln sent to holders of JP Policies subjected to the 2017 COI Increases, announcing increases effective beginning on August 1, 2017, did not specify in the same detail why COI rates were increasing.  Lincoln instead advised its insureds that "[COI] rates are based on certain cost factors, including mortality, interest, expenses and the length of time policies stay in force.  Our future expectations for these cost factors have changed; therefore, policy COI rates have been adjusted to appropriately reflect these future expectations."  In reality, the 2017 COI Increases are, among other things, (1) improperly based on factors other than those permitted by the COI Rate Provision of the JP Policies and (2) not justified by the cost factors enumerated in the policies.  There have been no events affecting mortality, interest rates, or expenses that would justify such a sudden and drastic increase in COI rates.

### 1.   The 2017 COI Increases Were Not Based on the Enumerated Factors

57.   As noted above, the JP Policies subjected to the 2017 COI Increases include the COI Rate Provision stating that "cost of insurance rates . . .  will be based on our expectation of future mortality, interest, expenses and lapses" and that "[a]ny change in the . . .  cost of insurance rates used will be on a uniform basis for insureds of the same rate class."[5]

---

[5]  The Desmonds Declaration states that the Legend 3000 series policy (a) allows an additional factor relating to "taxes" to be considered when adjusting COI rates and (b) specifies that COI changes may apply to all insureds with the same combination of Attained Age, sex, length of time the policy has been in force, and rate class.  Desmonds Decl. at ¶ 8.  Upon information and belief, none of Lincoln's statements to JP policyholders, to regulators, or to the market at large attributes the 2017 COI Increases to a change in Lincoln's expectations concerning taxes.  Similarly, the allegations in this Complaint regarding lack of uniformity are not based on the other factors – Attained Age, sex, length of time the policy has been in force – contained in the Legend 3000 policy's uniformity provision.  Thus, the differences between the relevant COI rate provisions are not material to the claims made in this Complaint.

58.     The four purported justifications relied upon by Lincoln to explain the 2017 COI Increases are pretextual and do not justify the increases in COI rates, some of which are as high as 200% or more.

59.     First, for similar reasons to those set forth above in ¶¶ 44-46, the 2017 COI Rate Increases are not supported or justified by updated mortality assumptions determined in a manner consistent with recognized actuarial standards – which must be based on credible mortality experience studies.   To the contrary, Lincoln's mortality experience has greatly improved, not worsened, in the years since the JP policies were designed and priced.

60.     In its NAIC Interrogatories filed with regulatory authorities from 2010 to 2014, Lincoln consistently attested that "[m]ortality experience is also predicted to ***improve*** in the future." (Emphasis added).   In its 2015 Annual Statement, Lincoln stated that "mortality experience is predicted to improve in the future."   In its SEC 10-Q for the third quarter of 2016 Lincoln reported that "[m]ortality was in line with [Lincoln National's] expectations" and in its 2016 Annual Statement, Lincoln reported that the company "experienced modestly favorable mortality" in 2016.   And during Lincoln's earnings call on August 3, 2017, Chief Financial Officer Randal J. Freitag confirmed that the Lincoln's "[m]ortality experience was consistent with expectations" and that "mortality is [sic] largely performed in line with our expectation."

61.     As recently as September 6, 2017, Lincoln once again emphasized to the investment community that it has achieved "consistent mortality results [from 2010 through 2016] despite quarterly volatility" and that it has experienced "[m]ortality consistent with expectations."   Lincoln presented the following graphic depicting that, far from experiencing worsening mortality, the company had experienced mortality consistent with its prior and current expectations:



62.     Lincoln's reported past and expected future mortality improvements are consistent with industry experience.  As alleged above, and as reflected in industry standard mortality tables, mortality has improved continuously over the years since the Jefferson-Pilot policies were priced and issued.  Since the JP Policies were priced, mortality rates have improved steadily – *i.e.*, because people are living much longer than anticipated when the products were priced and issued, the probability of death is lower.  By way of example, the most recent industry table reflects that mortality has improved to a level of about 60% of the mortality reported in the 1980 CSO Mortality Table used to price many of the JP Policies.[6]

---

[6]  The Desmonds Declaration states that the maximum COI rates for the JP UL policies were derived from the 1958 CSO Table; the maximum COI rates for the JP LifeSight series and JP Vision 20 series were derived from the 1980 CSO Table; and the maximum COI rates for the JP Legend 3000 series were derived from the 2001 CSO Table.  Desmonds Decl. ¶ 14.  Using those statements as a guide, they do not contradict that mortality rates have improved over at least the

63.    Second, the 2017 COI Increases cannot be justified based on Lincoln's purported "[e]xpected lower investment earnings as a result of projected low interest rates and lower future account values."  "Investment earnings" – which appears in COI rate provisions in policy forms issued by other insurance companies – is not included in the enumerated permissible bases for a COI Rate increase set out in the JP Policies' COI Rate Provision, nor is "future account values." The "interest" cost factor referenced in the JP policies encompasses interest credited to policies – which creates a true cost for the insurance company – and is entirely separate from "investment earnings," which refers to the amount Lincoln earns on the assets acquired with policyholder premiums.

64.    Because Lincoln asserts only that it expects lower "investment earnings as a result of projected low interest rates and lower future account values" (in other words, lower *profits*) and not that it anticipates higher projected interest *costs* (higher interest credited to policies), the 2017 COI Increases cannot be justified by the enumerated "interest" cost factor.  Similarly, because Lincoln at all times has earned positive interest spreads – in other words, the interest rates earned on its assets has been higher than the rates credited to policies – the 2017 COI Increases cannot be explained or justified by the enumerated "interest" cost factor.

65.    In addition, as alleged in the April 19, 2017 Complaint, when Lincoln announced the 2016 COI Increases it admitted the increases were intended at least in part to offset *past* low interest rates and those interest rates' impact on past profitability rather than on forward-looking future expected experience.  The 2017 COI Increases, resulting in rate hikes as high as 200%, if

---

past 37 years since the 1980 CSO Table.  The mortality rates in the most recent Table show that mortality rates have improved significantly in comparison with both the 1958 CSO Table and the 2001 CSO Table.

not more, likewise cannot be explained or justified by recent changes in projected future interest rates.

66.    Notwithstanding the low interest rates prevailing since 2008, Lincoln's interest spreads on its interest sensitive products (including the JP Policies) have remained relatively stable:[7]

| Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|------|------|------|------|------|------|------|------|------|------|
| **Interest Spread** | 1.60% | 1.49% | 1.97% | 1.97% | 1.99% | 1.84% | 1.77% | 1.65% | 1.56% |

67.    Contrary to Lincoln's assertion to its JP policyholders that the 2017 COI Increases are justified by lower projected future investment earnings, company management has repeatedly assured investors that both future interest rates and the company's earnings are projected to increase.  During an August 3, 2017 earnings call, Lincoln CFO Randal Freitag stated:

> When we set our assumption last year, we set an assumption that assumed that interest rates would increase over time.   And if you look at what's happened over the last year, underlying treasuries are up probably about 60 basis points from where they were at 9/30 of last year, while spreads have come in a little bit.  But net-net, the rates have increased, in line with our assumption we set last year.

During the same call, Lincoln CEO Dennis Glass stated that Lincoln's "investment portfolio remains very well diversified and a very high quality" and that "spread compression continues to abate."

68.    On September 12, 2017, CEO Glass attended the Barclays Global Services Conference.  Again, contrary to Lincoln's assertion that the 2017 COI Increases are justified by recently changed expectations of lower interest rates and lower investment earnings, Glass told

---

[7]    Lincoln   Financial   Group   Annual   Reports   to   Shareholders,   *available   at* https://www.lfg.com/public/aboutus/investorrelations/financialinformation/annualfilings.

conference attendees that Lincoln has "really been able to overcome low interest rates over the last four or five years."  CEO Glass stated that Lincoln's current assumptions project **increasing** interest rates in future years:

> So, I think as that headwind for interest rates burns off and it was going to burn off in the next five years, whether or not interest rates go any higher than they are today because the portfolio rate is going to come down to the new money rate and so compression goes away and that's good.
>
> \* \* \*
>
> So our assumptions although **there's some upswing in our expectations for interest rate in our assumptions**, I think **over the next 20 years we're going to be beating our interest rate assumption than we have in pricing rather than not meeting it the way we have over the last 20 years**.  So I think as I look forward I think the life insurance business can be a very very good outcome.[8]

69.     These statements by CEO Glass confirm that, far from the projected future lower investment earnings and low interest rates used by Lincoln as a pretext for the 2017 COI Increases, the Lincoln Defendants actually project future increases in prevailing interest rates and less spread compression.  CEO Glass' statements that Lincoln projects interest rates beating priced-for interest assumptions over the next 20 years "rather than not meeting [pricing assumptions] the way we have over the last 20 years" shows that the 2017 COI Increases were backward-looking and not based on any change in projected future cost of insurance factors as required by the COI Rate Provision in the JP Policies.

70.     Lincoln's attempt to justify the 2017 COI Increases as based on "updated expenses" is likewise pretextual and provides no basis for the massive 2017 COI Increases.  Administrative expenses represent a very modest component of the COI Rates for the JP Policies

---

[8]     Lincoln National Corporation's (LNC) CEO Dennis Glass Presents at Barclays Global Financial Services Conference Transcript, 12 September 2017, at 10-11, *available at*: https://seekingalpha.com/article/4106204-lincoln-national-corporations-lnc-ceo-dennis-glass-presents-barclays-global-financial?part=single (emphasis added).

and pale in comparison to the mortality experience cost factor.  As one Society of Actuaries study based on a survey of 125 insurance companies notes, the expense of administering a typical life insurance policy averages only about $4 per month.[9]  Thus, even relatively substantial changes in future expected expenses would have a minimal impact on the COI Rates charged by Lincoln, if those rates were in fact determined in accordance with the cost factors enumerated in the COI Rate Provision.

71.     Lincoln has admitted that any changes in projected future expenses are so modest they should be immaterial to the COI Rate determination.  In its answers to the required NAIC interrogatories every year from 2011 through 2016, Lincoln has stated that "it is anticipated that policy administration expenses will continue to increase in the future ***with inflation***."  (Emphasis added).  Lincoln also represented that it periodically updates its experience factors, including its expense cost factor.  Thus, during each of the five years preceding the 2017 COI Increases, Lincoln reported no substantial change in the trajectory of its projected expenses and, to the contrary, projected that expenses would increase only at the same rate as general inflation, which remained very low throughout the same period.[10]

72.     Finally, future projected mortality rates, interest rates, expenses, and lapses, in combination, could not possibly justify the sudden and dramatic rate hike imposed by the 2017 COI Increases.

---

[9]   *See* Society of Actuaries report on 2018 Generally Recognized Expense Table, *available at* https://www.soa.org/resources/research-reports/2017/2018-gret-recommendation/.

[10]  Notable, as well, is that at no time since 2006 – when Lincoln acquired Jefferson-Pilot – has Lincoln mentioned in its annual reports any adverse change in the JP Program regarding reinsurance for the policies at issue; nor have Lincoln National's recent earnings releases mentioned losses due to any increased reinsurance costs.

### 2.   The 2017 COI Increases Operate to Recoup Past Losses

73.     Because the JP Policies require that COI rates be based on *future* expected experience factors, Lincoln may not impose COI Rate increases to increase profits beyond the level assumed at pricing, or use COI rate increases to make up for losses or for profits in prior years that were lower than those assumed at pricing. *See generally* ¶¶ 47-52, above.

74.     Lincoln has acknowledged this prohibition in its answers to the NAIC interrogatories filed with the regulators every year since at least 2010.   As part of its Determination Procedures contemplated by Actuarial Standard of Practice No. 1, Lincoln has acknowledged to regulators each year that for all new products, "policy cost factors are determined based on a stated profit objective."   Those cost factors are "periodically reviewed and may be adjusted based on changes in prospective assumptions" to match the profit target established at pricing, but must be "made in such a way that past losses (*i.e.*, experience less favorable to the Company than expected) are not recouped."

75.     Notwithstanding Lincoln's consistent acknowledgement of these principles, the 2017 COI Increases operate to recoup past losses in contravention of the operative JP Policy provisions.   The JP Policies subjected to the 2017 COI Increases, like those impacted by the 2016 COI Increases, were originally priced with "reverse select and ultimate" COI charges, meaning that the policies were designed to generate high mortality profits in the early durations followed by projected mortality deficiencies (losses) in later durations.   Jefferson-Pilot designed the policies this way in order to: (1) gain a competitive advantage by illustrating low premium costs to prospective purchasers; (2) generate early duration profits for the company; and (3) push losses into later durations that could be discounted at high interest rates thereby reducing the reported financial impact on overall profitability.   Now that the JP Policies are reaching the later durations when the priced-for losses were projected to occur, Lincoln is attempting to impose the

excessive 2017 COI Increases to recoup prior losses, make the policies more profitable in future durations than the profit levels assumed at pricing, and cause shock lapses that would eliminate Lincoln's ultimate payment obligations under the JP Policies.

76.     The facts alleged above – including the dramatic *improvements* in mortality over the years since the JP policies were issued, Lincoln's own projected *increases* in future interest rates and interest spreads, and Lincoln's relatively stable and predictable administrative expenses – confirm that the 2017 COI Increases represent an impermissible attempt by Lincoln to increase the profitability of the closed block of policies — policies that are no longer sold actively, but are accounted on the financial statements of a life carrier as premium-paying policies – well beyond the profit levels assumed at pricing in order to recoup prior losses or previously constrained profits.

77.     Furthermore, Lincoln consistently issued in force JP Policy illustrations from at least 2010 through 2016 that, as required by the governing insurance regulations, represented to policyholders that the current COI Rates were supported by the Company's current expected experience.   And, from at least 2010 through 2015, Lincoln consistently represented to regulators in its NAIC interrogatory answers that there was *no* "substantial probability that illustrations authorized by the company to be presented on . . . existing business cannot be supported by currently anticipated experience."  There were no changes in any of the financial or operating conditions affecting the enumerated cost factors that would or could justify COI Rate increases of the suddenness and magnitude of the 2017 COI Increases.

78.     The admissions made by Lincoln and CEO Glass that the 2016 COI Increases were imposed to address years of persistently low *prior* interest rates, as alleged in ¶ 48, also apply to the 2017 COI Increases imposed the very next year.  Glass' public statements quoted in

¶¶ 67-68 above – made only one month after the effective date of the 2017 COI Increases – provide further evidence that the rate hike was implemented because Lincoln was "not meeting [its pricing assumptions] over the last 20 years" and that rather than simply achieving the priced-for profits in future durations, the COI increases would allow the company "over the next 20 years . . . to be beating our interest rate [pricing] assumption."  That is the very definition of recouping prior losses.

79.     For the reasons alleged above, Lincoln acted in bad faith and breached the implied covenant of good faith and fair dealing by imposing the 2017 COI Increases in order to offset or subsidize its own obligation to honor the credited interest guarantees contained in the JP Policies by increasing dramatically the charges taken from policyholders' account values.

80.     In sum, by imposing the 2017 COI Increases, Lincoln seeks to avoid its obligation to credit the guaranteed interest rates under the JP Policies; to recoup past losses or past reduced profits; and to shed the policies by making them cost-prohibitive to the mostly elderly and vulnerable policyholders, thereby inducing "shock lapses" and frustrating policyholders' ability to receive their contractual benefits under the Policies.

### 3.  The 2017 COI Increases Are Not Uniform

81.     Except as noted above with regard to the Legend 3000 policy, the JP policies' COI Rate Provision requires that "[a]ny change in the monthly cost of insurance rates used will be on a ***uniform*** basis for Insureds of the same rating class."  (Emphasis added.)  This policy provision is consistent with actuarial standards (including Actuarial Standard of Practice No. 1) and with uniform insurance regulations prohibiting insurance companies from discriminating between or among insureds within the same rate class.

82.     The 2017 COI Increases – including the increases put into place for the Legend 3000 policy – violate the uniformity provisions requiring that any change in the COI Rates be on

a uniform basis for insureds within the same rate class.  The 2017 COI Increases were not implemented with respect to policies insuring residents of New York who were within the same rate classes as those whose policies were impacted by the 2017 increases.  The New York Department of Financial Services expressly confirmed that "the Jefferson Pilot increases were never pursued in New York."  Lincoln also applied the 2017 COI Increases to certain policies while maintaining COI Rates for other policies within the same policy class covering insureds within the same rating class.

## COI INCREASES CLASS ACTION ALLEGATIONS
### ("COI Increases Class" and State Law Sub-Classes)

83.    This action is brought by Plaintiffs individually and on behalf of the following class – referred to herein as the "COI Increases Class" – which consists of:

> All owners of universal life insurance policies issued by Jefferson-Pilot Corporation (now The Lincoln National Life Insurance Company) whose COI Rates were increased as a result of the 2017 COI Increases (excluding defendant Lincoln, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

84.    This action is also brought on behalf of the named Plaintiffs and associated sub-classes of the COI Increases Class, as set forth below in the claims for relief (the "State Law Sub-Classes").  The COI Increases Class and State Law Sub-Classes each consists of thousands of consumers of life insurance and each is thus so numerous that joinder of all members is impracticable.  The Desmonds Declaration stated that there are approximately 28,000 JP Policies impacted by the 2017 COI Increases.  The identities and addresses of class members can be readily ascertained from business records maintained by Lincoln.

85.    The claims asserted by Plaintiffs are typical of the claims asserted by the COI Increases Class and the State Law Sub-Classes.

86.     Plaintiffs will fairly and adequately protect the interests of the COI Increases Class, and do not have any interests antagonistic to those of the other members of this class.

87.     Plaintiffs have retained attorneys who are knowledgeable and experienced in life insurance matters, COI increase matters, as well as class and complex litigation.

88.     Plaintiffs request that the Court afford class members with notice and the right to opt-out of any class certified in this action.

89.     This action is appropriate as a class action pursuant to Rule 23(b)(3), Rule 23(b)(2) and Rule 23(b)(1), of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members.  Those common questions include:

(a)     the construction and interpretation of the form JP Policies at issue in this litigation;

(b)     whether Lincoln's actions to increase the cost of insurance charges on the JP Policies violated the terms of those policies;

(c)     whether Plaintiffs and class members are entitled to receive damages as a result of the unlawful conduct by Lincoln alleged herein and the methodology for calculating those damages;

(d)     whether Lincoln's illustrations sent to JP policyholders were materially misleading;

(e)     whether Lincoln's decision to increase COI Rates applies generally to the class, so that injunctive relief is appropriate respecting the class as a whole;

(f)     whether Lincoln has engaged in the financial abuse of elders within the meaning of California's Elder Abuse Statute;

(g)      whether inconsistent or varying adjudications with respect to individual class members concerning the propriety of the COI increases would establish inconsistent standards of conduct; and

(h)      whether adjudications concerning the COI increases would, as a practical matter, be dispositive of interests of other class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

90.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)      the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)      when Lincoln's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)      this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)      without a class action, many class members would continue to suffer injury, and Defendants' violations of law will continue without redress while Defendants continue to reap and retain the substantial proceeds of its wrongful conduct; and

(e)      this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF
### Breach of Express Contract against Lincoln
### (on behalf of Plaintiffs and the COI Increases Class)

91.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

92.     Lincoln is the successor-in-interest to Jefferson-Pilot Life Insurance Company and is a party to the JP Policies issued to Plaintiffs and the members of the COI Increases Class.

93.     The JP Policies are binding and enforceable contracts, all of which contain the COI Rate Provision.

94.     Lincoln's 2017 COI Increases have materially breached the JP Policies, including the COI Rate Provision.

95.     Plaintiffs have performed all of their obligations under the JP Policies, except to the extent that their obligations have been excused by Lincoln's conduct as set forth herein.

96.     As a direct and proximate cause of Lincoln's material breaches of the JP Policies, Plaintiffs and the COI Increases Class have been and will continue to be damaged as alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (on behalf of Plaintiffs and the COI Increases Class)

97.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

98.     Lincoln is the successor-in-interest to Jefferson-Pilot Life Insurance Company and is a party to the JP Policies issued to Plaintiffs and the members of the COI Increases Class.

99.     The JP Policies are valid, enforceable contracts between Lincoln, as successor-in-interest to Jefferson-Pilot and Plaintiffs and the other members of the COI Increases Class.

100.     Implied in the JP Policies are contractual covenants of good faith and fair dealing, through which Lincoln owes Plaintiffs and the other members of the COI Increases Class a duty to act in a manner that does not deny them the fruits of their contracts or otherwise frustrate their reasonable expectations under the JP Policies.

101.     Lincoln breached the contractual covenant of good faith and fair dealing because, to the extent Lincoln had the discretion to increase the COI Rate and Monthly Deduction, it exercised that discretion to the disadvantage of JP policyholders in violation of its obligation of good faith and fair dealing.   The breaches further imposed unduly burdensome premium increases that have caused "shock lapses" of policies for which Plaintiffs and the other members of the COI Increases Class had paid years of premiums.

102.     Defendants' contractual breach of the covenant of good faith and fair dealing has proximately caused damages to Plaintiffs and the members of the COI Increases Class in an amount to be determined at the time of trial.

**THIRD CLAIM FOR RELIEF**
**Injunctive Relief as to COI Increases**
**(on behalf of Plaintiffs and the COI Increases Class)**

103.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

104.     Defendants engaged in the following practices, among others:

a.      Imposing the COI increases even though Defendants' expectation of future mortality has improved and is better than the mortality upon which the original COI rate schedule is based – in order to increase premiums, recoup past losses, or force policyholders to surrender their policies (forcing "shock lapses"), all of which are designed to enhance Defendants' profit margin contrary to, and precluded by, the terms of the policies.

b.      After the sale of the JP Policies, sending annual reports, policy servicing statements, illustrations and other documents and correspondence to Plaintiffs and the members of the Class without disclosing that there

would be sudden, dramatic, and cost-prohibitive increases in the COI rate in the summer of 2017.

c.     Failing to provide any meaningful advance warning that they intended to suddenly and massively increase the COI amount commencing in the summer of 2017.

d.     Ultimately providing a false and misleading explanation to Plaintiffs and the members of the Classes of the grounds for the 2017 COI Rate Increases.

105.   On behalf of the general public and the COI Increases Class, Plaintiffs respectfully request that the Court issue an injunction against Defendants preliminarily and permanently enjoining them (i) from continuing to engage in the unlawful and unfair conduct and preventing Defendants from collecting the unlawfully and unfairly increased COI amounts in violation of the JP Policies, and (ii) ordering any JP Policy to be reinstated that was surrendered or terminated as a result of the COI Increases.

106.   On behalf of the general public and the COI Increases Class, Plaintiffs further respectfully request that this Court order restitution to be paid by Defendants to the Class for COI charges, amount of the increased premiums paid, and other amounts wrongfully required, obtained and collected as the result of the 2017 COI Rate Increases in violation of the JP Policies.

107.   Plaintiffs respectfully requests an award of attorney fees as the prevailing party in their request for injunctive relief and restitutionary relief against Defendants on behalf of themselves and the members of the COI Increases Class.

**FOURTH CLAIM FOR RELIEF**
**Violations of the North Carolina Deceptive and Unfair Trade Practices Act,**
**N.C. Gen. Stat. § 75-1, *et seq.***
**(on behalf of Plaintiffs and the COI Increases Class)**

108.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.  This claim is brought on behalf of all Plaintiffs, including Plaintiff Tutor, a resident of North Carolina, and the COI Increases Class.

109.    The North Carolina Deceptive and Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1, makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

110.    Lincoln engaged in unfair and deceptive acts by surreptitiously raising the COI rate for the JP Policies and representing that these rate increases were in fact justified, when in reality Lincoln knew that its rate increase was not justified by future mortality rates (or any other proper justification for rate increases).  Lincoln's conduct frustrated the performance of the contract, and deceptively misled JP policyholders about the true reasons for the increase, in order to hide the breach.  This conduct offended established public policy in North Carolina, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, and amounts to an inequitable assertion of Lincoln's power and position over these form contracts.

111.    Lincoln's conduct was in commerce and affected commerce.  Lincoln's conduct had a substantial in-state effect on North Carolina trade and commerce.  In part because Jefferson-Pilot, prior to its acquisition by Lincoln in 2006, was headquartered and conducted a significant portion of its business in North Carolina, billions of dollars of affected policies were sold to North Carolina residents as well as residents of other states from Jefferson-Pilot's headquarters in North Carolina.  Lincoln engaged in a single course of conduct impacting both North Carolina residents and residents nationwide.

112.    As a direct and proximate result of these unfair and deceptive commercial practices, the members of the COI Increases Class have been damaged by having to pay higher COI Charges and Monthly Deductions, causing the depletion of policy account values, and by facing burdensome premium increases that have caused "shock lapses," and are entitled to recover actual and treble damages as well as attorneys' fees and costs and all other relief allowed under N.C. Gen. Stat. §§ 75-16 and 75-16.1.

**FIFTH CLAIM FOR RELIEF**
**Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(on behalf of the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class)**

113.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.  This claim is brought on behalf of the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class.  The California Sub-Class consists of all members of the COI Increases Class, where the policy was issued for delivery in California.

114.    Defendants committed acts of unfair competition in violation of California Business and Professional Code §§ 17200 *et seq.*

115.    Under the language of the JP Policies, Defendants offered flexible premiums that would allow JP policyholders to fund only enough premiums to cover the monthly deductions, promised that Lincoln would not raise the COI Rate and consequent Monthly Deduction except based on certain anticipated future expense factors stated in the policies and, as acknowledged by its NAIC filings, would not raise the cost of insurance in order to recoup past losses.  Defendants made those representations in the JP Policies, on its website, its marketing materials and press releases, and its interrogatory responses in Lincoln's 2015 Annual Statement to the NAIC.

116.    Defendants have willfully violated Section 17200 *et seq.* by increasing COI Rates in order to recoup past losses despite assurances and representations that it would not do so, and

doing so as part of an unfair and deceptive scheme designed to force policy lapses by virtue of burdensome premium increases – a tactic known as "shock lapses."

117.    The aforementioned conduct is likely to mislead and has misled reasonable consumers acting reasonably under the circumstances.  For example, reasonable consumers expect that when they purchase flexible-premium universal life insurance, they need only pay the minimum premiums required to cover the COI charges and standard expense charges.  No reasonable consumer would expect that Defendants would punish consumers for doing exactly that, force them to increase their policy values upon threat of massive COI increases, and thereby effectively convert their flexible-premium policies into fixed-premium policies, or otherwise force them to let their policies lapse in the face of such COI rate hikes.

118.    Defendants' conduct is consumer-oriented and of a recurring nature.  Lincoln, and its predecessor Jefferson-Pilot, marketed and sold JP policies to the public at large in California pursuant to form insurance policies that are contracts of adhesion.  Thousands of such JP policies, including the JP Policies at issue in this Complaint, have been sold and thousands of the JP policyholders have been affected.

119.    As a direct proximate cause of violation of Section 17200 *et seq.*, the Kesselhaut and Trinchero Plaintiffs and members of the California Sub-Class Members have been damaged as alleged herein in an amount to be proven at trial.

120.    The Kesselhaut and Trinchero Plaintiffs, on behalf of themselves and members of the California Sub-Class, seek monetary damages and injunctive relief, as well as costs and reasonable attorneys' fees.

## SIXTH CLAIM FOR RELIEF
### Violations of California Elder Abuse Statute, Cal. Welf. & Inst. Code §§ 15610 *et seq.*
### (on behalf of the Kesselhaut Plaintiffs and the California Elder Abuse Sub-Class)

121.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.  This claim is brought on behalf of the Kesselhaut Plaintiffs and the California Elder Abuse Sub-Class.  The California Elder Abuse Sub-Class consists of all members of the COI Increases Class, who were age 65 or older and were residents of California when the JP Policy was issued.

122.    This cause of action is brought under California's Welfare and Institutions Code section 15610, *et seq.*

123.    Each member of California Elder Abuse Sub-Class was 65 years or older at all times relevant to this claim.

124.    By imposing the COI Increases, Defendants took, depleted, appropriated and/or retained the Kesselhaut Plaintiffs and the California Elder Abuse Sub-Class members' personal property in bad faith for a wrongful use and/or with the intent to defraud, which constitutes financial abuse as defined in California Welfare & Institutions Code section 15610.30.

125.    Defendants are guilty of oppression, fraud, and malice in the commission of the above-described acts of abuse.  At a minimum, Defendants knew or should have known that their conduct was likely to be harmful to elders.

126.    Under California Civil Code section 3294 Defendants are liable to the Kesselhaut Plaintiffs and the California Elder Abuse Sub-Class members for actual and punitive damages.

127.    Under California Welfare & Institutions Code section 15657.5 Defendants are liable to the Kesselhaut Plaintiffs and the California Elder Abuse Sub-Class members aged 65 years or older for reasonable attorney fees and costs.

## SEVENTH CLAIM FOR RELIEF
### Tortious Breach of the Duty of Good Faith and Fair Dealing
### (on behalf of the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class)

128.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.  This claim is brought on behalf of the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class.

129.    Life insurance policies, like those owned by the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class, protect them from the economic harm and risk presented by death.  As is the case with most insurance contracts, Lincoln's financial interests and the policyholders' financial interests are directly at odds: Lincoln benefits from increasing the COI charges to policyholders and the policyholders are harmed by such increases.

130.    For these reasons, Lincoln owes the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class a heightened duty of good faith and fair dealing.  Among other things, Lincoln must refrain from doing anything to injure JP policyholders' right to receive the benefits of the JP Policies.  Lincoln is required to give at least as much consideration to the welfare of the JP policyholders as it gives to its own interests.  Furthermore, Lincoln has a duty to reasonably inform the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class of their rights and obligations under the JP Policies.

131.    As alleged above, Lincoln has breached these duties in connection with the 2017 COI Increases, thereby frustrating the reasonable expectations of the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class and tortiously depriving them of benefits under the JP Policies.  In increasing the COI Rates, Lincoln did not give proper consideration to the welfare of the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class and served solely its own

interests at their expense.  In addition, Lincoln has failed to truthfully, let alone reasonably, disclose or describe its course of conduct, or the basis and reasons for its course of conduct.

132.    Lincoln's alleged acts and omissions were and are unreasonable and without proper cause.  If left unabated, Lincoln's conduct will frustrate and deprive the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class of the reasonably expected benefits of the Policies.

133.    Lincoln has, in particular, improperly withheld benefits due to the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class under the JP Policies, because the unlawful COI increases have both (a) reduced their account values, and (b) reduced the amount of interest credited on their policy accounts.  The unlawful COI increases have further caused "shock lapses" of policies by imposing massive, unwarranted and unexpected required payments that, in many instances, make the policies untenable.

134.    Lincoln's tortious breach of the covenant of good faith and fair dealing has proximately caused damages to the Kesselhaut and Trinchero Plaintiffs and the California Sub-Class in an amount to be determined at the time of trial.

135.    Lincoln's conduct was intentional, deliberate, and constitutes oppression, fraud, or malice.  The Kesselhaut and Trinchero Plaintiffs and the California Sub-Class are entitled to recover punitive and exemplary damages in an amount to be determined by the trier of fact. Plaintiffs also seek an order requiring Lincoln to disgorge all profits that it received in connection with the above referenced wrongful acts and omissions.

136.    In addition, unless Lincoln is permanently enjoined from continuing to deduct the unlawfully increased Monthly Deductions, the Kesselhaut and Trinchero Plaintiffs and the

California Sub-Class will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF
### Violations of 28 Tex. Admin. Code §§ 21.2206 to 21.2212, Tex. Ins. Code art. 21.21
### (on behalf of Plaintiff Life Partners and the Texas Sub-Class)

137.     Plaintiffs re-allege and incorporate all allegations of this complaint as if fully set forth herein.  This claim is brought on behalf of Plaintiff Life Partners and the Texas Sub-Class. The Texas Sub-Class consists of all members of the COI Increases Class, where the policy was issued for delivery in Texas.

138.     Defendants represented that their illustrations were based on their current expected future expenses and that COI rates would not increase above illustrated levels unless there was a change in their current expected future expenses from those that underlay the illustrations.

139.     If Lincoln's story is to be believed, the illustrations provided to Plaintiff Life Partners and its predecessors in interest showed improperly favorable non-guaranteed elements and illustrated non-guaranteed elements in a misleading manner.  Subchapter N of the Texas Department of Insurance Trade Practices regulations, Rule § 21.2204, requires that Insurers develop a "Disciplined current scale" to act as a "limit on illustrations."  This scale must be "**reasonably** based on actual **recent** historical experience."   Rule §21.2204(5) (emphases added).  Insurers may not use an illustration that "depicts performance more favorable to the policy owner."  Rule § 21.2206(2)(E) – Prohibited conduct.  If Lincoln's justification of the COI increase is to be believed, the illustration provided to Life Partners in 2015, for example, depicted performance more favorable to the policy holder than would have been possible using a scale that was reasonably based on their recent experience.  The reason for this is simple: as

45

described in detail above, Lincoln's expectations could not have changed between 2015 and 2017 in a large enough manner to justify such a massive COI increase, and Lincoln has never said anything publicly to suggest otherwise (despite its many pronouncements on the grounds for the increase). These misleading illustrations caused Life Partners and its predecessors in interest to pay more in premiums than it otherwise would have.

140.   None of Lincoln's reasons for the increase justifies this massive increase.

141.   First, Lincoln claims the rate hike is justified by updated mortality assumptions. But Lincoln's mortality expectations and experience have *improved* between 2015 and 2017. As alleged above: (a) Lincoln has filed interrogatories with the NAIC in each year from 2010 to 2015 stating that it expects mortality experience to improve; (b) Lincoln's 2015 Annual Statement stated that "mortality experience is also predicted to improve in the future"; (c) its Quarterly Report on Form 10-Q filed with the SEC for the third quarter of 2016 stated that "[m]ortality was in line with [Lincoln National's] expectations" during the third quarter of 2016; and (d) Lincoln's 2016 Annual Report stated that "[i]n 2016, we experienced modestly favorable mortality." Improving mortality – which has occurred continuously for Lincoln over the relevant period – increases the period over which premiums are received and concomitantly reduces payout of death benefits. There thus cannot have been a change in mortality since 2010 that would justify *increasing* COI charges; rather, the mortality experience and expectations should have led to a *decrease* in COI charges.

142.   This trend of improving mortality has also been observed industry-wide. The Society of Actuaries has published three valuation basic tables (VBT) since 2000: the 2001 Valuation Basic Mortality Table; the 2008 Valuation Basic Table; and the 2015 Valuation Basic Table. The tables show consistent improvement in mortality expectations in the industry, from

one table to the next, and confirm the unreasonableness of changes of over 40% to the COI rate charged to Plaintiff Life Partners.  In 2015, the Society of Actuaries published a report indicating that industry experience studies have shown significant improvement in the mortality rates experienced by the industry from that underlying the 2001 tables.  The Society of Actuaries noted that in developing the tables, the 2015 tables relied on data from 2002-2009, and projected mortality improvement through 2015 based on industry data.  In updated tables for 2017, the Society of Actuaries explained that it would continue to project mortality improvement through 2017 based on more recent industry data.  In sum, given that mortality is the most important component of COI charges, and that mortality has improved in recent years, it is not possible that Lincoln's COI rates are appropriate now *and* that Lincoln accurately forecasted much lower future COI rates in previous years.

143.    Second, Lincoln has pointed to low interest rates as justifying its decision to raise COI rates, claiming that lower rates require higher COI charges.  But if interest rates and COI charges are inversely related, as Lincoln claims, then *increasing* interest rates cannot justify an *increase* in the COI charges.  And yet, interest rates have *increased* since 2015; the federal funds rate remained at 0.25% from December 2008 to December 2015 before increasing.  And Lincoln's press release in 2017 announcing the increase pointed to "[l]ower investment income as a result of ***continued*** low interest rates," indicating that whatever experience allegedly led to the increase had already been in place in prior years.  Thus, as with mortality, there is no basis for Lincoln to raise COI rates based on alleged changes from recent years.  Further, Lincoln points to investment income as a reason for the increase, but Lincoln's investment income is not an enumerated factor under the policy (only "interest" is), and is not a *cost* of insurance.

144.    Third, reinsurance costs are not costs of insurance and reinsurance is not an enumerated factor, and there has been no change in reinsurance costs from recent years that would justify an increase of this size.  As alleged above, Lincoln National's recent earnings releases do not mention losses due to increased reinsurance costs at all – in fact, its Q4 2014 results show a $53 million *profit* on recapturing policies from out of reinsurance contracts. Further, the New York insurance department has recently announced final regulations explaining that reinsurance costs cannot be used to justify COI increases because they are not costs of insurance.  Whatever changes there have been in Lincoln's future reinsurance expectations cannot provide material support for the increase.

145.    Pursuant to Tex. Ins. Code art. 21.21 § 16(b), Plaintiff Life Partners and the Texas Sub-Class are entitled to (1) actual damages plus court costs and reasonable and necessary attorneys' fees, (2) treble damages for a knowing violation, (3) an injunction against the COI Rate Increases, and (4) any other relief that the court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    Certifying this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding Plaintiffs and the COI Increases Class and State Sub-Classes compensatory damages, punitive damages, restitution, disgorgement, and any other relief permitted by law or equity;

3.    Awarding Plaintiffs and the COI Increases Class and State Sub-Classes pre-judgment and post-judgment as well as costs, and all other relief set forth above;

4.    Awarding Plaintiffs and the injunctive class injunctive relief, as well as attorneys' fees and costs; and

5.      Awarding Plaintiffs and the Classes such other relief as this Court may deem just

and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

trial by jury as to all issues so triable.

Dated:  April 12, 2018

Jeffrey W. Golan
Robert A. Hoffman
Lisa M. Port
**Barrack, Rodos & Bacine**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

and

Stephen R. Basser
One America Plaza
600 W. Broadway, Suite 900
San Diego, CA 92101

**Girard Gibbs LLP**
Daniel C. Girard
Angelica Ornelas
601 California Street, #1400
San Francisco, CA  94108

**Bonnett Fairbourn Friedman & Balint,
P.C.**
Andrew Friedman
Francis J. Balint, Jr.
2325 E Camelback Rd #300
Phoenix, AZ 85016

**Susman Godfrey L.L.P.**
Steven G. Sklaver
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

and

Seth Ard
Jillian Hewitt
Lucas Issacharoff
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019

**The Moskowitz Law Firm, PLLC**
Adam M. Moskowitz
Howard Bushman
2 Alhambra Plaza
Suite 601
Coral Gables, FL  33134
Telephone: (305) 479-5508

**Kozyak Tropin & Throckmorton LLP**
Gail A. McQuilkin
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134

*Attorneys for Plaintiffs*